## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| BUREAU VERITAS COMMODITIES AND TRADE, INC., | § § § | Civil Action No. |
| *Plaintiff*, | § § § | Judge: |
| v. | § § § | Magistrate Judge: |
| RENISHA NANOO, CHARLES HUNTER, RANDY LAURIE, AND COTECNA INSPECTION, INC., | § § § | **JURY TRIAL DEMANDED** |
| *Defendants.* | § § § | |

## PLAINTIFF'S VERIFIED ORIGINAL COMPLAINT

Plaintiff Bureau Veritas Commodities and Trade, Inc. ("Bureau Veritas") files this Verified Original Complaint against Defendants Renisha Nanoo ("Nanoo"), Charles Hunter ("Hunter"), Randy Laurie ("Laurie"), and Cotecna Inspection, Inc. ("Cotecna") (collectively, "Defendants"). This civil action arises out of the misappropriation of Bureau Veritas' confidential information and trade secrets by Defendants and the breach of restrictive covenants and confidentiality obligations by Defendants Nanoo, Hunter, and Laurie. Bureau Veritas seeks damages and injunctive relief under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*, the Louisiana Uniform Trade Secrets Act, La. R.S. § 51:1431 *et seq.*, the Louisiana Unfair Trade Practices and Consumer Protection Law, La. R.S. § 51:1401 *et seq.*, the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*, and for breaches of contract, breaches of fiduciary duty, conversion, civil conspiracy, and unjust enrichment.

## I.
## INTRODUCTION

1.     Bureau Veritas, formerly known as Inspectorate America Corporation ("Inspectorate"), provides independent inspection, sampling, testing, and certification services to

a broad range of industries, including—as relevant here—metals and minerals.  Over the past several decades, Bureau Veritas' Metals and Minerals ("M&M") Division created, perfected, and safeguarded its quality control systems and supply chain processes to serve its customers on a personal basis.  Based on these methodologies and customer relationships, Bureau Veritas developed price lists, discount schedules, processes, methods, and other confidential and proprietary information.

2.      Until recently, Cotecna, a global competitor of Bureau Veritas, did not have an established M&M business in North America.  Within a matter of months, and through the theft of Bureau Veritas' trade secrets and violations of employees' restrictive covenants and confidentiality obligations (such as those of Nanoo, Hunter, and Laurie (collectively, the "Individual Defendants")), Cotecna has created a competing M&M business in North America and has stolen Bureau Veritas' customer relationships.  Specifically, rather than creating its own M&M business through decades of effort and resources—as Bureau Veritas did—Cotecna, Nanoo, Hunter, and Laurie, along with five other former senior management and/or key employees of Bureau Veritas located in Texas, executed a clandestine plan—while still employed by Bureau Veritas—to divert Bureau Veritas' employees, customers, and trade secrets to Cotecna.

3.      From February to June 2020, Defendants executed the plan, which included, among other actions, the resignations of all of Bureau Veritas' M&M Division's senior management team (except for one employee), the deliberate closing of one of Bureau Veritas' labs to open a competing lab for Cotecna in Louisiana, and interfering with Bureau Veritas' efforts to retain valuable employees (such as Hunter).  Nanoo and the five former Texas-based employees all joined Cotecna between May and June 2020, with Hunter and Laurie following

shortly thereafter around September 2020, in nearly identical roles and quickly began pursuing business from Bureau Veritas' M&M customers.

4.     In the months preceding her resignation, Nanoo prepared for her exodus by gathering Bureau Veritas' confidential information to aid in acquiring its customers for Cotecna. On the last two days of her employment with Bureau Veritas (on June 18 and 19, 2020), Nanoo connected two separate personal external hard drives to her Bureau Veritas laptop, one of which contained thousands of confidential files of Bureau Veritas, including customer lists and information, pricing information, financial information, and an archive copy of Nanoo's .pst Outlook files. Nanoo failed to return either device to Bureau Veritas upon her resignation and knowingly kept the devices containing Bureau Veritas' trade secrets and confidential information after leaving Bureau Veritas.  Nanoo also accessed Bureau Veritas' secure M&M network, containing Bureau Veritas' confidential, proprietary, and trade secret information regarding its M&M Division, during the last week of her employment and, upon information and belief, deleted files from Bureau Veritas' network.

5.     Once Nanoo and the former Texas-based Bureau Veritas employees joined Cotecna per the orchestrated plan, they quickly began soliciting Bureau Veritas' customers and building Cotecna's competing Solid Fuels lab in Louisiana—all while using Bureau Veritas' confidential information and trade secrets.  When Bureau Veritas became aware that Nanoo and the other former employees resigned—not for individual, personal reasons—but as part of a larger scheme with Cotecna, it initiated a lawsuit in Texas state court against the former employees[1] and Cotecna to put an end to their unlawful conduct.[2]   Nanoo successfully

---

[1] Bureau Veritas did not name Hunter or Laurie as a defendant in the Texas state court action because Bureau Veritas did not learn that Hunter and Laurie joined Cotecna until after the lawsuit was filed.

[2] This lawsuit is styled *Bureau Veritas Commodities and Trade, Inc. v. Richard Scott Allinson, Joseph Chapman,*

challenged the Texas state court's exercise of personal jurisdiction over her. Accordingly, Bureau Veritas now files the instant Complaint against Defendants in Louisiana—where personal jurisdiction is undeniably established—to stop Defendants' continued misappropriation of Bureau Veritas' confidential information and trade secrets as well as the Individual Defendants' breaches of their restrictive covenants and confidentiality obligations.

## II.
## THE PARTIES

6.     Plaintiff Bureau Veritas is a Delaware corporation with its principal place of business in Harris County, Texas. Bureau Veritas is formerly known as Inspectorate America Corporation. Inspectorate changed its name to "Bureau Veritas Commodities and Trade, Inc." effective March 1, 2020.

7.     Defendant Nanoo is an individual resident of Orleans Parish, Louisiana and may be served in the State of Louisiana at her residence at 812 Gravier Street, Apartment 1212, New Orleans, Louisiana 70112, or wherever she may be found.

8.     Defendant Hunter is an individual resident of Louisiana (upon information and belief, either Orleans Parish or Jefferson Parish) and may be served in the State of Louisiana at his residence or wherever he may be found.

9.     Defendant Laurie is an individual resident of Jefferson Parish, Louisiana and may be served in the State of Louisiana at his residence at 312 Jade Avenue, Metairie, Louisiana 70003, or wherever he may be found.

10.     Defendant Cotecna is a Delaware corporation registered to do business in the State of Louisiana and is doing business in Jefferson Parish, Louisiana. Its principal business office is located at 40 Veterans Memorial Boulevard, Kenner, Louisiana 70062. Cotecna may be

---

*Joshua Husvar, Renisha Nanoo, Stefanus Nel, and Cotecna Inspection Inc.*, Cause No. 2020-51445, filed in the 215th Judicial District Court of Harris County, Texas on August 26, 2020.

served with process in the State of Louisiana by serving its registered agent, C T Corporation System, 3867 Plaza Tower Drive, Baton Rouge, Louisiana 70816.

### III.
### JURISDICTION AND VENUE

11.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.  Bureau Veritas' action arises under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 *et seq.*, and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*  The Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367.

12.     Venue in this district is proper pursuant to 28 U.S.C. § 1391.  Defendants reside in this district and a substantial part of the events or omissions giving rise to Bureau Veritas' claims occurred in this district.

### IV.
### FACTUAL BACKGROUND

The facts underlying Bureau Veritas' claims against Defendants are as follows:

A.    **Bureau Veritas grows its M&M Division and develops its confidential information.**

13.    Bureau Veritas provides independent inspection, sampling, testing, and certification services to a broad range of industries, including oil and petrochemicals, metals and minerals, and agri-commodities and fertilizers.  Such professional inspection services—the core of Bureau Veritas' business—are utilized whenever the custody of goods or commodities transfers between buyers, sellers, and traders.

14.    Bureau Veritas' M&M Division specializes in supply chain management through the sampling, inspection, and analysis of metals and minerals.  Bureau Veritas' network of laboratories, strategically located in key trading locations, provides precision analytical testing to

both internationally recognized standards and customer-specific methodologies 24 hours a day, 365 days of the year.

15.     Over the past several decades, Bureau Veritas' M&M Division created, perfected, and safeguarded its quality control systems and supply chain processes to serve its customers on a personal basis.  Bureau Veritas developed methodologies tailored to each customer—from inspecting carriers, refineries, and stockpiles to auditing bank vaults and storage facilities.  Based on these methodologies and customer relationships, Bureau Veritas developed price lists, discount schedules, processes, methods, and other confidential and proprietary information.

16.     The M&M Division involves a collaborative network of specialized employees and contractors, including inspectors, samplers, technicians, chemists, and auditors.  Inspectors are responsible for supervising sample preparation at third party sites for laboratory analysis.  Samplers are responsible for utilizing their knowledge to physically collect and prepare samples of products and raw materials for laboratory analysis.  Chemists are responsible for utilizing their expertise in analytical techniques, such as fire assay and gravimetric analysis, to measure the weight and purity of various metals.

17.     The M&M Division is also supervised by managers, which, prior to her resignation for Cotecna, included Nanoo.  Managers engage in strategic decision-making and personnel planning, but are additionally responsible for interfacing with the customer both onsite and in the office, serving as the customer's point of contact.  For several years until his departure for Cotecna, Nanoo reported to Stefanus "Fanie" Nel ("Nel") in his role as Vice President/Director—Metals, Minerals & North Latin America.

**B.      Bureau Veritas entrusts the Individual Defendants with confidential information and trade secrets.**

18.     Bureau Veritas expended significant time, money, and effort in developing its

M&M Division and distinguishing itself from its competitors. Bureau Veritas recruited and trained senior officials and entrusted them with confidential, proprietary, and trade secret information. Such confidential information and/or trade secrets included, without limitation, information regarding customers (pricing, rates, discounts, customer contacts, customer preferences, customer needs), vendors, bids/quotes, inventory, operations, marketing, pricing, financials, budgets, sales, employee compensation, technology, and other commercial and operational information not generally known to the public.

19.     The senior officials and/or key laboratory employees who had access to, and Bureau Veritas entrusted with, such confidential information and trade secrets included, without limitation:

       a.  Defendant Nanoo, employed from approximately October 21, 2013 until June 19, 2020 in Louisiana, as Laboratory Manager—Minerals and Agri (Nanoo was employed with another Bureau Veritas entity outside the United States since 2006);

       b.  Defendant Hunter, who was a Sample Prep Technician at Bureau Veritas' Virginia lab from approximately June 2019 until July 1, 2020; and

       c.  Defendant Laurie, who was a Laboratory Technician at Bureau Veritas' Louisiana lab from approximately September 2014 until September 10, 2020.

20.     Nanoo was second-in-command after Nel (the most senior leader in the M&M Division) for one of the three business units within the M&M Division—the Solid Fuels business. The Solid Fuels business, run by Nanoo, includes solid fuels testing (from standard coal tests to specialists tests such as coke reactivity and petrography), design, installation, and operation of mechanical sampling systems, plant compliance auditing, and production monitoring.

21.     As the leader of her business unit, Nanoo was responsible for all operational, financial, and management matters for the Solid Fuels operational and laboratory locations. The

Solid Fuels' primary office location is in Marrero, Louisiana with a laboratory in the same location, which is where Laurie worked.  The Solid Fuels division also had a laboratory in Virginia, which is where Hunter worked prior to joining Cotecna.  Bureau Veritas closed the Virginia lab at the urging of Nel (and, upon information and belief, Nanoo participated in this scheme to close the Virginia lab to cripple Bureau Veritas' ability to service its M&M customers).  Nanoo's duties included, among many others, identifying and developing new business opportunities, directing client marketing and development, handling the profit and loss of her business unit, developing customer relationships, reviewing client contracts, approving invoices, conducting pricing assessments, hiring and firing of employees, and managing financial performance and budget control.

22.     Accordingly, given the nature of Nanoo's job duties, she was exposed to all facets of Bureau Veritas' confidential information and trade secrets necessary to operate the Solid Fuels business unit.  Hunter and Laurie likewise were exposed to all facets of Bureau Veritas' confidential information and trade secrets necessary to operate its labs in Virginia and Louisiana, including, without limitation, the customer and vendor contacts for lab analyses, the equipment used by Bureau Veritas, the testing processes and procedures, and the certificates of analyses issued by Bureau Veritas to its customers. And prior to their employment with Bureau Veritas, the Individual Defendants did not have access to or knowledge of such confidential information or trade secrets.

23.     Bureau Veritas has expended significant time, effort, and expense developing and maintaining its confidential information and trade secrets, recruiting and training senior officers, managers, and lab employees to support its customer-based projects, and developing relationships with its M&M Division customers.  Bureau Veritas' financial success and ability to

compete in the metals and minerals sampling, analysis, testing, and certification business hinges on its confidential information and trade secrets. Bureau Veritas, therefore, considers its confidential information and trade secrets highly confidential and proprietary and vigorously safeguards such information, files, and documents as trade secrets. Bureau Veritas' confidential information and trade secrets are not readily available to the public, nor readily ascertainable from information in the public domain. Undoubtedly, Bureau Veritas would be unfairly and competitively disadvantaged if any employee improperly used or disclosed its confidential information and/or trade secrets.

24.     Consequently, Bureau Veritas has implemented measures to preserve and protect the confidentiality of its confidential information and trade secrets, such as requiring employees to sign agreements in which they agree to keep Bureau Veritas' confidential information (as defined therein) confidential and protect it through associated restrictive covenants, restricting access to confidential information stored on Bureau Veritas' network, password protecting electronically stored confidential information, requiring employees to attend annual Code of Ethics training, and including confidentiality disclaimers on emails transmitted to third parties.

**C.     Nanoo, Hunter, and Laurie agreed not to use or disclose Bureau Veritas' Confidential Information and Nanoo and Hunter further agreed to additional restrictive covenants.**

25.     Nanoo signed an Employee Invention Assignment and Confidentiality Agreement ("Confidentiality Agreement") with Inspectorate (n/k/a Bureau Veritas) upon the start of her employment with Bureau Veritas in the United States in October 2013. (Nanoo Confidentiality Agreement, attached as Exhibit A.) Laurie signed the same Confidentiality Agreement upon the start of his employment with Bureau Veritas on September 2, 2014. (Laurie Confidentiality Agreement, attached as Exhibit B.) The Confidentiality Agreements define "Confidential

Information" as including, without limitation, "all information belonging to, used by, or developed by Inspectorate or its customers including or relating to internal operations, policies and procedures, business strategies, pricing, billing information, actual or potential customer lists, contracts, contract terms and conditions, sales lists, process descriptions, financial data, marketing plans, technology, software source codes, research and development plans, business plans, computer programs, computer software and systems, inventions, developments, formulas, and trade secrets" as well as "[e]mployee lists, employee salary information, and other non-public information regarding Inspectorate's personnel."    (Exs. A and B, Confidentiality Agreements at 1.)  The Confidentiality Agreements further provide that Nanoo and Laurie may not disclose to anyone outside of Bureau Veritas, or use for themselves or on behalf of others, any of Bureau Veritas' Confidential Information (as defined by the Confidentiality Agreements) which they may have access to or originate as part of their employment with Bureau Veritas. (*Id.*)  The Confidentiality Agreements expressly state that this non-disclosure obligation extends after employment regardless of the reason for termination.  (*Id.*)

26.     The Confidentiality Agreements also prohibit Nanoo and Laurie from removing, during his or her employment or upon termination of his or her employment, any records which contain any Confidential Information, and further required Nanoo and Laurie to return all copies of Confidential Information which are in his or her possession or control upon termination.  (*Id.*)

27.     Nanoo also signed a Confidentiality, Non-Solicitation, and Assignment of Rights Agreement ("Restrictive Covenant Agreement") on October 19, 2017 with Inspectorate (n/k/a Bureau Veritas), in which she agreed to the following non-disclosure and non-solicitation covenants:

> a.   In Section 1(a), Nanoo agreed not to directly or indirectly publish or disclose, or use or make available to others for use, any Confidential Information of

Bureau Veritas (or any affiliates) that Bureau Veritas (or any affiliates) disclosed or made available to Nanoo during her employment. "Confidential Information" is defined in the Restrictive Covenant Agreement as "[a]ll documents or information, in whatever form or medium, regarding the business or affairs of the Company and its affiliates including, without limitation, information as to the Company's and the Company's affiliates' products, services, systems, designs, inventions, research and development, processes, techniques, protocols, training, finances (including prices, costs and revenues), budgets, forecasts, marketing strategies, marketing plans, sales, sales strategies, sales methods, operations, prospects, pricing, pricing strategies, programs, methods of operation, prospective and existing contracts, customer lists, customer preferences, vendor lists, vendor preferences, supplier lists, supplier preferences, and other business arrangements or business plans, procedures, practices, and strategies";

b.  In Section 1(e), Nanoo agreed to return to Bureau Veritas, upon the termination of her employment, all Confidential Information, company property, and proprietary materials in her possession, custody, or control, and further agreed to destroy, upon the termination of her employment, any information or documents containing or reflecting any Confidential Information or relating to the business of Bureau Veritas (or any affiliates) from any computer, cellular phone, electronic storage device, or other digital or electronic device in her possession, custody, or control (and to certify such destruction in writing to Bureau Veritas as well as provide Bureau Veritas such devices for inspection upon request);

c.  In Section 2(a)(ii), Nanoo agreed, for a period of six (6) months following the termination of her employment with Bureau Veritas, not to directly or indirectly, in the Restricted Area, solicit business from or interfere with, or attempt to solicit business from or interfere with, any actual or prospective customer, service provider, vendor, or supplier of Bureau Veritas (or any affiliate) with whom Bureau Veritas (or any affiliate) did business or solicited within the eighteen (18) months prior to Nanoo's termination from employment and (1) who or which Nanoo contacted, called on, serviced, or did business with on behalf of Bureau Veritas (or any affiliate) during her employment, or (2) about whom Nanoo received Confidential Information (defined as "Customers" in the Restrictive Covenant Agreement). "Restricted Area" is defined as Calcasieu Parish, East Baton Rouge Parish, East Feliciana Parish, Jefferson Parish, Jefferson Davis Parish, Lafayette Parish, Plaquemines Parish, St. Charles Parish, and St. James Parish;

d.  In Section 2(a)(ii), Nanoo also agreed not to, during the six (6) month restricted period in the Restricted Area, directly or indirectly induce, or attempt to induce, any Customers to curtail or cancel any business or contracts with Bureau Veritas (or any affiliate); and

e.  In Section 2(b), Nanoo agreed not to, during the six (6) month restricted period, directly or indirectly hire, solicit, or recruit, or attempt to hire, solicit, or recruit, or encourage to leave or otherwise cease his/her employment with Bureau Veritas (or any affiliate), any individual who is an employee, or was an employee within the six month period prior to Nanoo's termination, of Bureau Veritas (or any affiliate).

(Nanoo Restrictive Covenant Agreement, attached as <u>Exhibit C</u>.)

28.    Hunter also signed a Confidentiality, Non-Competition, Non-Solicitation, and Assignment of Rights Agreement ("Restrictive Covenant Agreement") upon the start of his employment on June 12, 2019[3], in which he agreed to the following non-disclosure and non-solicitation covenants:

a.  In Section 1(a), Hunter agreed not to directly or indirectly publish or disclose, or use or make available to others for use, any Confidential Information of Bureau Veritas (or any affiliates) that Bureau Veritas (or any affiliates) disclosed or made available to Hunter during his employment. "Confidential Information" is defined in the Restrictive Covenant Agreement as "[a]ll documents or information, in whatever form or medium, regarding the business or affairs of the Company and its affiliates including, without limitation, information as to the Company's and the Company's affiliates' products, services, systems, designs, inventions, research and development, processes, techniques, protocols, training, finances (including prices, costs and revenues), budgets, forecasts, marketing strategies, marketing plans, sales, sales strategies, sales methods, operations, prospects, pricing, pricing strategies, programs, methods of operation, prospective and existing contracts, customer lists, customer preferences, vendor lists, vendor preferences, supplier lists, supplier preferences, and other business arrangements or business plans, procedures, practices, and strategies";

b.  In Section 1(e), Hunter agreed to return to Bureau Veritas, upon the termination of his employment, all Confidential Information, company property, and proprietary materials in his possession, custody, or control, and further agreed to destroy, upon the termination of his employment, any information or documents containing or reflecting any Confidential Information or relating to the business of Bureau Veritas (or any affiliates)

---

[3] Hunter's Restrictive Covenant Agreement mistakenly identifies "Bureau Veritas North America, Inc." as the "Company" made party to the agreement; however, this is merely a misnomer in the agreement, which does not diminish, in any way, Bureau Veritas' standing to pursue the relief to which it is entitled due to Hunter's violations of the agreement.  Notably, Hunter's offer letter from Bureau Veritas (f/k/a Inspectorate) stated that his offer of employment was contingent upon his "signing the Confidentiality, Non-Solicitation and Assignment of Rights Agreement dated 6/21/17 Version 1 upon the start of your employment . . . ." (Hunter Offer Letter, attached as <u>Exhibit E</u>.)

from any computer, cellular phone, electronic storage device, or other digital or electronic device in his possession, custody, or control (and to certify such destruction in writing to Bureau Veritas as well as provide Bureau Veritas such devices for inspection upon request);

c.  In Section 2(a)(2), Hunter agreed, for a period of six (6) months following the termination of his employment with Bureau Veritas, not to become employed by or perform services for any company that is engaged in, or about to become engaged in, any testing, inspection, and/or certification business within, among other parishes, Jefferson Parish, Louisiana (provided that Hunter's provision of services are the same as or substantially similar to the services he provided to Bureau Veritas or that are otherwise likely to result in the use or disclosure of Confidential Information);

d.  In Section 2(b)(ii), Hunter agreed, for a period of twelve (12) months following the termination of his employment with Bureau Veritas, not to directly or indirectly, in the Restricted Area, solicit business from or interfere with, or attempt to solicit business from or interfere with, any actual or prospective customer, service provider, vendor, or supplier of Bureau Veritas (or any affiliate) with whom Bureau Veritas (or any affiliate) did business or solicited within the eighteen (18) months prior to Hunter's termination from employment and (1) who or which Hunter contacted, called on, serviced, or did business with on behalf of Bureau Veritas (or any affiliate) during his employment, or (2) about whom Hunter received Confidential Information (defined as "Customers" in the Restrictive Covenant Agreement). "Restricted Area" is defined as Calcasieu Parish, East Baton Rouge Parish, East Feliciana Parish, Jefferson Parish, Jefferson Davis Parish, Lafayette Parish, Plaquemines Parish, St. Charles Parish, and St. James Parish;

e.  In Section 2(b)(ii), Hunter also agreed not to, during the twelve (12) month restricted period in the Restricted Area, directly or indirectly induce, or attempt to induce, any Customers to curtail or cancel any business or contracts with Bureau Veritas (or any affiliate); and

f.  In Section 2(c), Hunter agreed not to, during the twelve (12) month restricted period, directly or indirectly hire, solicit, or recruit, or attempt to hire, solicit, or recruit, or encourage to leave or otherwise cease his/her employment with Bureau Veritas (or any affiliate), any individual who is an employee, or was an employee within the six month period prior to Hunter's termination, of Bureau Veritas (or any affiliate).

(Hunter Restrictive Covenant Agreement, attached as Exhibit D.)

29.    Because the success of any company, particularly one that provides such specialized services, fundamentally depends on its confidential, proprietary, and trade secret

information, it is imperative that Bureau Veritas' confidential information and trade secrets be kept in strict confidence.  Otherwise, Bureau Veritas loses its viability to compete in the marketplace.  For this very reason, Bureau Veritas required Nanoo and Laurie to sign the Confidentiality Agreement and Nanoo and Hunter to sign the Restrictive Covenant Agreement as a condition to their employment to protect Bureau Veritas' confidential information, trade secrets, business goodwill, and other legitimate business interests.

**D.  The Individual Defendants join Cotecna to expand its M&M division, set up its competing lab, and steal Bureau Veritas' customers.**

30.    Cotecna is a global competitor of Bureau Veritas, providing testing, inspection, and certification services in four key sectors of government and trade solutions, agriculture, food safety, and metals and minerals.  However, in the United States, Cotecna has only three offices and 42 full-time employees—eight of which are the Individual Defendants and former Texas-based M&M Division employees of Bureau Veritas.  While Cotecna operates globally in the minerals sector (similar to the Solid Fuels business of Bureau Veritas' M&M Division), Cotecna is not a primary player in the solid fuels testing, inspection, and certification business in North America. Moreover, prior to the former Bureau Veritas employees joining Cotecna, Cotecna did not have an established precious metals business in North America.

31.    Cotecna hired Nanoo, along with the other former Texas-based Bureau Veritas M&M Division employees, to grow its M&M business in North and Latin America and to lure Bureau Veritas' employees and contractors to staff its expanding division.  Cotecna hired Hunter and Laurie to start up its competing lab being built in Louisiana.  Cotecna knew that mirroring Bureau Veritas' method of investing its *own* time, money, and effort over a 20+ year period to develop a competitive M&M division in North and Latin America would prove difficult.  Rather than substantially investing in research, personnel, lab equipment, and customer relationships,

Cotecna decided to raid Bureau Veritas' key employees and steal its confidential information and trade secrets.

32.     Within a span of less than two months, Bureau Veritas lost almost its entire M&M senior management team (except for one employee) to Cotecna, including Nanoo—the Bureau Veritas employee with the most knowledge regarding Bureau Veritas' Solid Fuels business and Solid Fuels labs.  Bureau Veritas also lost two of its key lab employees, Hunter and Laurie, to Cotecna.  Upon information and belief, Nanoo interfered with Bureau Veritas' efforts to retain Hunter after its closing of the Virginia lab where he worked (which, coincidentally, was closed at the advice of Nel, and presumably Nanoo, while Nel, Cotecna, and the other former employees were conspiring together to steal Bureau Veritas' M&M Division).

33.     This mass exodus of senior management from Bureau Veritas' M&M Division has crippled Bureau Veritas' M&M Division and positioned Cotecna to acquire Bureau Veritas' customers. Indeed, since moving to Cotecna, Nanoo has begun soliciting Bureau Veritas' customers and has successfully lured customers to switch their business to Cotecna.  Nanoo, Hunter, and Laurie are also in charge of opening Cotecna's new lab in Louisiana.

**E.     Nanoo conspires with Nel to concoct and execute "The Plan."**

34.     Beginning in February 2020, Nel reached out to Cotecna's global CEO, Sebastien Dannaud ("Dannaud"), to craft a secret plan for Cotecna to ransack Bureau Veritas' M&M Division ("The Plan").  At the time, Cotecna was not a primary player in the solid fuels business and did not have an established precious metals business in North America. Notably, in initial discussions with Nel, Dannaud credited Cotecna's expanded presence in minerals abroad over the last three years to the recruitment of people from Inspectorate in Asia and Europe. Naturally,

then, when Nel approached Cotecna with the chance to raid the senior staff of Bureau Veritas for a North American expansion, Cotecna seized the opportunity.

35.     Notably, from the inception of The Plan, Nel and Cotecna were mindful of the serious legal risks and schemed to avoid court procedures. In fact, Nel (and, upon information and belief, Nanoo) attempted to use his knowledge of Bureau Veritas' previous court cases involving trade secret theft to prepare Cotecna for the known risks involved with stealing the Individual Defendants and the other former Bureau Veritas employees over the course of a few months. Importantly, Nel and Cotecna were acutely aware of the former employees' restrictive covenants and confidentiality obligations. Indeed, on February 26, 2020, months before she resigned (and prior to the COVID-19 pandemic), Nanoo sent her Restrictive Covenant Agreement to Nel, who then forwarded it to Cotecna.

36.     From February to September 2020, Defendants—along with the Texas-based former Bureau Veritas M&M Division employees—executed The Plan.  Nel resigned first in April 2020, followed by Nanoo and the other former Texas employees in May and June 2020, and Laurie in September 2020.  Even though Bureau Veritas laid off Hunter as part of Bureau Veritas' closing of the Virginia lab, Bureau Veritas sought to place Hunter in another position within the company.  Upon information and belief, Nanoo interfered with Bureau Veritas' efforts to retain Hunter as an employee (because his joining Cotecna was part of The Plan).  The Individual Defendants, along with the former Texas employees, joined Cotecna in nearly identical roles, and Nanoo quickly began pursuing business from Bureau Veritas' M&M customers in violation of her Restrictive Covenant Agreement.

**F.    Nanoo steals Bureau Veritas' confidential information and trade secrets before leaving Bureau Veritas.**

37.    Nanoo, upon resigning from Bureau Veritas, stole a significant amount of Bureau Veritas' confidential information and trade secrets, undoubtedly for the benefit of the other former Bureau Veritas employees and Cotecna.  Nanoo was provided a company-issued laptop and a username and password to access Bureau Veritas' private network server and documents and files.   On June 18, 2020 and June 19, 2020—her second to last day and last day of employment, respectively—Nanoo connected two separate personal Seagate external hard drives to her Bureau Veritas laptop.  Nanoo did not return either external hard drive to Bureau Veritas upon her last day of employment, nor has she provided either device to Bureau Veritas for inspection.

38.    For one of the Seagate drives, Bureau Veritas' third-party forensic vendor, Xact Data Discovery ("XDD"), was unable to generate any listing of the files stored on the device. When files stored on an external device are opened on a computer, the computer creates a record of the file; if a user plugs in an external hard drive to her computer and drags and drops files over to the device, the computer does not create any record of this.   Thus, upon information and belief, Nanoo inserted the Seagate drive right before leaving Bureau Veritas, copied files onto the device, but did not open any of the files on her Bureau Veritas computer to create a record.

39.    For the other Seagate external hard drive, Nanoo had stored thousands of Bureau Veritas files containing confidential and trade secret information regarding Bureau Veritas' customers, subcontractors, pricing, financials, and labs.  Nanoo stored these files on this personal external hard drive throughout her Bureau Veritas employment up through her last day of employment on June 19, 2020.  Nanoo also created an archive copy of her Outlook .pst files and

stored them on this personal external hard drive on June 12, 2020—the same day Nanoo provided Bureau Veritas her notice of resignation.

40.     Notably, Nanoo accessed many of the files stored on her Seagate external hard drive from Bureau Veritas' M&M network shared drive.  However, many of the files listed as being stored on Nanoo's Seagate drive are no longer found on Bureau Veritas' M&M network shared drive.  Thus, upon information and belief, Nanoo deleted these files from Bureau Veritas' M&M network shared drive.

41.     Nanoo also had downloaded onto her Bureau Veritas computer a Dropbox account, which existed on the computer at least as of June 9, 2020.  The Dropbox account was associated with Nanoo's personal email (despite being on her company computer).  The Dropbox account was deleted sometime between June 9, 2020 and June 19, 2020.  However, the deletion of Nanoo's personal Dropbox account from her Bureau Veritas computer does not delete the corresponding files.

42.     Nanoo has failed to return any confidential information and/or trade secrets that she stole from Bureau Veritas.  Upon information and belief, Defendants are using the confidential information and trade secrets to expand Cotecna's metals and minerals businesses in North America, to solicit Bureau Veritas' customers, vendors, and contractors, and to build Cotecna's competing lab in Louisiana. For example, Nanoo's willingness to unlawfully disclose Bureau Veritas' confidential information and trade secrets is evidenced by, among other things, her disclosure in January 2020 of Bureau Veritas' highly confidential financial and budget information for the M&M Division to a non-Bureau Veritas employee.

**G.      Defendants' unlawful conduct must be restrained to avoid harm to Bureau Veritas.**

43.      Bureau Veritas expended significant time, effort, and resources in creating and growing its M&M Division.  Defendants have capitalized on such time, effort, and resources to help Cotecna establish its precious metals business, grow its solid fuels business, and create a competing lab in North America.  Defendants, therefore, have conspired to unfairly compete with Bureau Veritas.

44.      Further, it is virtually impossible for Defendants not to be using and/or disclosing Bureau Veritas' confidential information and trade secrets because the Individual Defendants continue to perform the same, or substantially similar, services on behalf of Cotecna for the same customers previously serviced while employed by Bureau Veritas.  Accordingly, the Individual Defendants are breaching the confidentiality covenants in their respective Confidentiality Agreements and Restrictive Covenant Agreements and the non-disclosure obligations of Louisiana law.  Additionally, Hunter is violating the non-competition covenant in his Restrictive Covenant Agreement by his employment with Cotecna, and Nanoo is violating the non-solicitation covenant in her Restrictive Covenant Agreement.

45.      Defendants' brazen conduct underscores the fact that Defendants' wrongful conduct will continue without court intervention.

46.      Given the competitive nature of Bureau Veritas' business and the vitality of the Confidential Information (as defined in the applicable agreements) to its financial success, harm is exceedingly imminent to Bureau Veritas if Defendants are allowed to continue using and/or disclosing Bureau Veritas' Confidential Information for their benefit.  Therefore, Defendants' violations of federal and Louisiana law will continue to cause Bureau Veritas irreparable harm unless this Court enjoins their impermissible activities.

## V.
## CAUSES OF ACTION

Based on the factual allegations in this Complaint, Bureau Veritas asserts the following causes of action against Defendants.

### COUNT I – BREACH OF CONTRACT
### (against Nanoo, Hunter, and Laurie)

47. Bureau Veritas incorporates by reference the preceding paragraphs in the Complaint.

48. Nanoo, Hunter, and Laurie each entered into an enforceable agreement with Bureau Veritas containing confidentiality/non-disclosure covenants. Hunter also entered into an enforceable agreement with Bureau Veritas containing a non-competition covenant.  Hunter and Nanoo additionally each entered into an enforceable agreement with Bureau Veritas containing non-solicitation of customer, vendor, contractor, and employee covenants.

49. The non-competition covenant in Section 2(a) and the non-solicitation covenant in Section 2(b) of Hunter's Restrictive Covenant Agreement, and the non-solicitation covenant in Section 2(a) of Nanoo's Restrictive Covenant Agreement meet the requirements of La. R.S. § 23:921 and, therefore, are valid and enforceable under Louisiana law.

50. Nanoo and Laurie breached their Confidentiality Agreements with Bureau Veritas by: (i) disclosing, or inevitably and/or probably disclosing, Bureau Veritas' Confidential Information (as defined in the Confidentiality Agreements); and (ii) failing to return all Confidential Information in their possession, custody, and control upon the termination of their employment with Bureau Veritas.

51. Nanoo also breached her Restrictive Covenant Agreement with Bureau Veritas by: (i) disclosing, or inevitably and/or probably disclosing, Bureau Veritas' Confidential

Information (as defined in the Restrictive Covenant Agreement); (ii) failing to return all Confidential Information in her possession, custody, and control upon the termination of her employment with Bureau Veritas; (iii) soliciting business from, and/or interfering with, in the Restricted Area Customers (as those terms are defined in the Restrictive Covenant Agreement); (iv) inducing, in the Restricted Area, Customers to curtail or cancel their business or contracts with Bureau Veritas; and (v) soliciting Hunter and Laurie for employment with Cotecna.

52.    Hunter breached his Restrictive Covenant Agreement with Bureau Veritas by: (i) disclosing, or inevitably and/or probably disclosing, Bureau Veritas' Confidential Information (as defined in the Restrictive Covenant Agreement); (ii) failing to return all Confidential Information in his possession, custody, and control upon the termination of her employment with Bureau Veritas; and (iii) becoming employed by and/or performing services for Cotecna, that are the same as or substantially similar to the services he provided to Bureau Veritas or that are otherwise likely to result in the use or disclosure of Confidential Information, in Jefferson Parish, Louisiana.

53.    The Individual Defendants' breaches of their respective agreements with Bureau Veritas will continue to cause Bureau Veritas irreparable harm unless this Court enjoins their impermissible activities.  Bureau Veritas has no adequate remedy at law and, therefore, seeks immediate relief in the form of a preliminary injunction and a permanent injunction to halt these Defendants' impermissible activities.  *See* La. R.S. § 23:921(H) ("In addition, upon proof of the obligor's failure to perform, and without the necessity of proving irreparable injury, a court of competent jurisdiction shall order injunctive relief enforcing the terms of the agreement.")

54.    Further, Nanoo and Laurie stipulated in their Confidentiality Agreements that in the event of a breach or threatened breach of the Confidentiality Agreement by them, Bureau

Veritas may suffer irreparable harm for which money damages would not be an adequate remedy; thus, they agreed that in the event of any breach, Bureau Veritas will have the right to seek injunctive relief against continuing or further breach without the necessity of proof of actual damages.  (Exs. A and B, Confidentiality Agreements at 2.)  Nanoo and Hunter similarly agreed in their Restrictive Covenant Agreements that a breach of such agreements will result in irreparable and continuing damage to Bureau Veritas, for which money damages may not provide adequate relief, and that Bureau Veritas shall be entitled to temporary or permanent injunctive relief to prevent the continuation of harm, without the necessity of establishing irreparable harm.  (Exs. C and D, Restrictive Covenant Agreements at § 3.)  These provisions are consistent with the relief available to Bureau Veritas under La. R.S. § 23:921(H).

55.     The Individual Defendants' breaches of their respective agreements with Bureau Veritas have damaged and will continue to damage Bureau Veritas in an amount that is not presently ascertainable.  Based on the Individual Defendants' current actions and their actual (as well as their inevitable and/or probable and/or threatened) use and disclosure of Bureau Veritas' Confidential Information, the Individual Defendants will continue to violate their agreements with Bureau Veritas and, as a result, cause irreparable injury to Bureau Veritas unless this Court enjoins them from doing so. Bureau Veritas demands that the Individual Defendants be ordered to pay all damages suffered by Bureau Veritas as a result of the foregoing breaches, including, without limitation, Bureau Veritas' lost profits, as expressly provided in La. R.S. § 23:921(H).

56.     Bureau Veritas also seeks to recover all reasonable and necessary costs and attorneys' fees incurred in bringing this breach of contract claim.  Hunter and Nanoo expressly agreed in Section 3 of their respective Restrictive Covenant Agreements that "in the event that Employee breaches or threatens to breach the restrictive covenants contained herein, [Bureau

Veritas] shall be entitled to . . . attorneys' fees, costs, and expenses." (Exs. C and D, Restrictive

Covenant Agreements at § 3.)

## COUNT II –VIOLATION OF DEFEND TRADE SECRETS ACT
### (against all Defendants)

57.     Bureau Veritas incorporates by reference the preceding paragraphs in the

Complaint.

58.     Bureau Veritas possesses highly unique and valuable information, including,

without limitation, its compilations of customer contact information, cost and pricing data,

customer history and preferences, laboratory equipment lists, testing procedures, and certificate

templates.  This compiled information is confidential, proprietary, not generally known to the

public, and constitutes trade secrets within the meaning of the Defend Trade Secrets Act of 2016,

18 U.S.C. § 1836 *et seq* ("DTSA").

59.     Bureau Veritas is headquartered in Texas but operates in other states, including in

Louisiana, and regularly transacts business in states other than Texas and Louisiana, including in

person and by phone, internet, and mail.  Bureau Veritas' trade secrets relate to this business and

are used by Bureau Veritas in interstate commerce.

60.     Bureau Veritas has taken reasonable measures to keep this information secret and

confidential, including but not limited to requiring its employees with access to such information

to sign confidentiality agreements, providing confidentiality policies, password-protecting access

to Bureau Veritas' electronically stored information, and limiting access rights to certain

information.

61.     This information has independent economic value because it is not generally

known to, and is not readily ascertainable by proper means by, persons other than Bureau Veritas

who could obtain economic value from its disclosure or use.  Bureau Veritas compiled its confidential and trade secret information over many years and at great expense.

62.     Defendants, by engaging in and continuing to engage in the conduct and activities described herein, have violated the DTSA through their improper acquisition, disclosure, and use of Bureau Veritas' trade secrets, which constitutes actual and threatened misappropriation.  Upon information and belief, the Individual Defendants perform and/or have performed essentially the same work for Cotecna that they performed for Bureau Veritas.  The Individual Defendants had, and continue to have, access to Bureau Veritas' trade secrets.

63.     Upon information and belief, Defendants have actually used, plan to use, and/or will inevitably use, Bureau Veritas' trade secrets and confidential information on behalf of Cotecna.  Given the similarities between the Individual Defendants' work for Bureau Veritas and Cotecna and the fact that Bureau Veritas and Cotecna are direct competitors, it is inevitable and/or threatened that the Individual Defendants will use and/or disclose Bureau Veritas' trade secrets in their work for Cotecna.

64.     Further, Nanoo stole thousands of Bureau Veritas files containing confidential and trade secret information regarding Bureau Veritas' customers, invoicing, subcontractors, labs, and financials and has failed to return any such information to Bureau Veritas.  Defendants are also using Bureau Veritas' trade secrets—including, without limitation, pricing, customer contact, and customer preferences information—to solicit Bureau Veritas' customers. Defendants additionally are using Bureau Veritas' trade secrets—including, without limitation, lab equipment lists and testing preferences and procedures—to build a competing lab in Louisiana.

65.     Defendants owed, and continue to owe, Bureau Veritas a duty to maintain the secrecy of its information.  Defendants knew or had reason to know, and continue to know or have reason to know, of that duty at the time they misappropriated Bureau Veritas' information without Bureau Veritas' consent.

66.     Bureau Veritas has and will continue to suffer irreparable harm as a result of Defendants' unlawful conduct and the disclosure and misappropriation of Bureau Veritas' confidential information and trade secrets.  Defendants' activities will result in a substantial loss of business for Bureau Veritas, now and in the future. Bureau Veritas has no adequate remedy at law because Defendants' actions are affecting its goodwill, reputation, and ability to compete in a highly competitive marketplace.  Bureau Veritas, therefore, is entitled to injunctive relief to prevent further irreparable harm under the DTSA.

67.     The actions of Defendants were willful, malicious, and intended to injure Bureau Veritas and its business.

68.     As a direct and proximate result of Defendants' misappropriation, Bureau Veritas has suffered irreparable harm, injuries, and damages, and will continue to suffer irreparable harm, injury, and damages, including but not limited to loss of relevant market share, injury to business reputation and goodwill, loss of profits, and attorneys' fees and costs.  Defendants have gained an unfair competitive advantage and other unjust enrichment through the misuse of Bureau Veritas' trade secrets.

69.     Under the DTSA, Bureau Veritas is entitled to and requests preliminary and permanent injunctive relief against Defendants to prohibit their use of Bureau Veritas' trade secrets.

70.     Under the DTSA, Bureau Veritas is entitled to and requests an award of damages in its favor for actual loss caused by the misappropriation, damages for all unjust enrichment caused by the misappropriation that is not addressed in computing damages for actual loss, and/or damages measured by imposition of liability for a reasonable royalty for the unauthorized disclosure or use of Bureau Veritas' trade secrets.

71.     Under the DTSA, Bureau Veritas is entitled to and requests exemplary damages in an amount not more than two times Bureau Veritas' actual damages, plus reasonable attorneys' fees.

## COUNT III – VIOLATION OF LOUISIANA UNIFORM TRADE SECRETS ACT
### (against all Defendants)

72.     Bureau Veritas incorporates by reference the preceding paragraphs in the Complaint.

73.     Bureau Veritas possesses highly unique and valuable information, including, without limitation, its compilations of customer contact information, cost and pricing data, customer history and preferences, laboratory equipment lists, testing procedures, and certificate templates.  This compiled information is confidential, proprietary, not generally known to the public, and constitutes trade secrets within the meaning of the Louisiana Uniform Trade Secrets Act, La. R.S. § 51:1431 *et seq.* ("LUTSA").

74.     Defendants acquired Bureau Veritas' trade secrets by improper means, including, without limitation, stealing Bureau Veritas' files, documents, and other records.

75.     Defendants intend to use and, upon information and belief, have used Bureau Veritas' trade secrets, without Bureau Veritas' express or implied consent.

76.     Defendants' acts of misappropriation were willful and malicious.

77.     As a direct and proximate result of Defendants' acts of misappropriation, Bureau Veritas has suffered and will suffer irreparable harm and damages.  Defendants have gained an unfair competitive advantage and other unjust enrichments through the misuse of Bureau Veritas' trade secrets.

78.     Under the LUTSA, Bureau Veritas is entitled to and requests preliminary and permanent injunctive relief against Defendants to prohibit their use of Bureau Veritas' trade secrets.

79.     Under the LUTSA, Bureau Veritas is entitled to and requests an award of damages in its favor for actual loss caused by Defendants' misappropriation, and damages for all unjust enrichment caused by Defendants' misappropriation that is not taken into account in computing damages for actual loss.

80.     Under the LUTSA, as a result of Defendants' willful and malicious misappropriation, Bureau Veritas is further entitled to and requests an award of its reasonable attorneys' fees.

### COUNT IV – VIOLATION OF COMPUTER FRAUD AND ABUSE ACT
### (against Nanoo)

81.     Bureau Veritas incorporates by reference the preceding paragraphs in the Complaint.

82.     During her employment at Bureau Veritas, Nanoo had access to Bureau Veritas' computer and computer network systems which contained Bureau Veritas' trade secrets and confidential information.  Specifically, Bureau Veritas provided Nanoo with a laptop computer and access to Bureau Veritas' M&M network shared drive. Bureau Veritas authorized Nanoo to access and use the laptop and network shared drive to perform her job responsibilities for Bureau Veritas throughout the United States and for the benefit of Bureau Veritas.  Bureau Veritas did

not authorize Nanoo to access or use the laptop or M&M network shared drive to abscond with Bureau Veritas' trade secrets and confidential information.

83.     The laptop and M&M network shared drive constitute a protected computer under the Computer Fraud and Abuse Act.  *See* 18 U.S.C. § 1030(e)(1).

84.     Nanoo used her Bureau Veritas laptop, the M&M network shared drive, and external storage devices (and, upon information and belief, a personal Dropbox account) to steal Bureau Veritas' confidential information and trade secrets from Bureau Veritas' private server and/or stored locally on Nanoo's laptop to use at Cotecna and for Cotecna's benefit.  Nanoo, therefore, exceeded the authorization Bureau Veritas granted her to use the laptop and computer network systems when she accessed those to save and copy Bureau Veritas' trade secrets and confidential information on external storage devices (and, upon information and belief, her personal Dropbox account).

85.     Nanoo violated the Computer Fraud and Abuse Act by: (i) accessing a protected computer; (ii) exceeding the authorization that Bureau Veritas granted her; (iii) knowingly and with intent to defraud; (iv) and thereby, furthered the intended fraud and obtained anything of value; and (v) causing a loss to Bureau Veritas aggregating at least $5,000 in value. *See* 18 U.S.C. § 1030(a)(4).

86.     As a result of Nanoo's actions, Nanoo absconded with Bureau Veritas' trade secrets and confidential information, which are valuable assets of Bureau Veritas exceeding $5,000.

87.     To investigate the full extent of Nanoo's fraudulent actions, Bureau Veritas had to obtain a digital forensic expert (namely, XDD) and spent (or will spend) in excess of $5,000 on the digital forensic expert in an attempt to uncover the full extent of Nanoo's fraudulent actions.

88.     Nanoo's fraudulent actions have injured, and continue to injure, Bureau Veritas. These injuries include the cost of a forensic expert and the loss of Bureau Veritas' trade secrets and confidential information.

89.     Under the Computer Fraud and Abuse Act, Bureau Veritas is entitled to and requests an award of compensatory damages and injunctive and other equitable relief.

## COUNT V – VIOLATION OF LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
### (against all Defendants)

90.     Bureau Veritas incorporates by reference the preceding paragraphs in the Complaint.

91.     Defendants' actions as alleged herein constitute unfair competition and unfair or deceptive acts or practices in the conduct of trade or commerce, including, without limitation, misappropriation of Bureau Veritas' trade secrets, improper access to Bureau Veritas' computer and network systems, breaches of fiduciary duties, and fraud.  These actions have been taken to benefit Defendants and to harm Bureau Veritas.

92.     Cotecna's management is aware of, encouraged, and/or engaged in this practice, which has allowed, and continues to allow, Cotecna to profit unjustly and to cause Bureau Veritas to suffer damages.

93.     Defendants' actions offend established public policy and were immoral, unethical, oppressive, unscrupulous, and substantially injurious to Bureau Veritas.

94.     Accordingly, Defendants violated Louisiana's Unfair Trade Practices and Consumer Protection Law, La. R.S. § 51:1401 *et seq*.

95.     As a direct and proximate result of Defendants' unfair competition and/or unfair or deceptive acts or practices, Bureau Veritas has suffered a loss of money and property, for which Defendants are liable.

96.     Notice of this Complaint will be sent to the Attorney General pursuant to La. R.S. § 51.1409(B) immediately upon filing.

97.     Bureau Veritas is entitled to an award of treble damages and reasonable attorneys' fees and costs, pursuant to La. R.S. § 51:1409.

## COUNT VI – BREACH OF FIDUCIARY DUTIES
### (against Nanoo)

98.     Bureau Veritas incorporates by reference the preceding paragraphs in the Complaint.

99.     As an employee of Bureau Veritas, Nanoo owed Bureau Veritas duties, including fiduciary duties of loyalty and due care, and a duty to be loyal and faithful to Bureau Veritas' interest in business.  At all relevant times, Nanoo was duty bound not to act in antagonism or opposition to the interest of Bureau Veritas.  This duty included the obligation to render a full and fair disclosure to Bureau Veritas of all facts which materially affect Bureau Veritas' rights and interests.

100.     Nanoo's duties of loyalty and due care to Bureau Veritas included, without limitation, duties not to act in opposition to Bureau Veritas' interests, not to use her position for personal gain at the expense of Bureau Veritas, not to use Bureau Veritas' property and information, including, without limitation, its confidential information, for her own purpose or the purpose of any third person, not to damage or attempt to damage Bureau Veritas' computer systems and network, and not to misappropriate Bureau Veritas' trade secrets.

101.    Nanoo breached her duties to Bureau Veritas when she engaged in dishonest and unlawful behavior, unfair trade practices, and theft for the purpose of her own financial or commercial benefit.  An action for breach of fiduciary duty based on misuse of a company's confidential information does not require that the information rise to the level of at trade secret.

102.    Bureau Veritas has suffered damages as a direct and proximate result of Nanoo's breaches of fiduciary duties.

### COUNT VII – UNJUST ENRICHMENT
### (against all Defendants)

103.    Bureau Veritas incorporates by reference the preceding paragraphs in the Complaint.

104.    By reason of the Individual Defendants' improper conduct, Defendants have been enriched.

105.    As a consequence of Defendants' unlawful acquisition, use, and/or disclosure of Bureau Veritas' confidential information and/or trade secrets, Bureau Veritas has suffered an impoverishment.

106.    Defendants' enrichment and Bureau Veritas' impoverishment were without justification or cause.

107.    Should Bureau Veritas have no remedy in law against any of the Defendants, they are bound to compensate Bureau Veritas in an amount equal to their enrichment or Bureau Veritas' impoverishment, whichever is less.

### COUNT VIII – CONVERSION
### (against Nanoo and Cotecna)

108.    Bureau Veritas incorporates by reference the preceding paragraphs in the Complaint.

109.    Nanoo knowingly downloaded and transferred confidential information owned by Bureau Veritas to one or more unreturned personal external storage devices without Bureau Veritas' authorization, knowledge, or consent and, in doing so, she violated her confidentiality obligations and Bureau Veritas' policies.  Certain of the files Nanoo stole from Bureau Veritas contain information that is confidential and proprietary but may not rise to the level of a trade secret.

110.    To date, Nanoo has not returned these external storage devices or otherwise returned the confidential and proprietary information that she improperly downloaded to them. Upon information and belief, Nanoo transferred this confidential and proprietary information to Cotecna, which continues to possess this information even though it knows that it was taken from Bureau Veritas without its authorization, knowledge, or consent.

111.    Nanoo and, upon information and belief, Cotecna are improperly using this confidential and proprietary information to compete against Bureau Veritas.

112.    Bureau Veritas seeks damages from Nanoo and Cotecna for their unlawful acquisition, possession, and refusal to return the confidential and proprietary information that Nanoo downloaded prior to her resignation.

## COUNT IX –CONSPIRACY
### (against Defendants)

113.    Bureau Veritas incorporates by reference the preceding paragraphs in the Complaint.

114.    Nanoo accessed, downloaded, uploaded, retained, and/or transmitted Bureau Veritas' confidential information and trade secrets with the specific and malicious intent to secure Bureau Veritas' customer base, business strategies, pricing, and service information to unlawfully compete against Bureau Veritas as an employee of Cotecna.  Further, upon

information and belief, the Individual Defendants were part of The Plan—orchestrated while still employed by Bureau Veritas—to recreate Bureau Veritas' M&M Division for Cotecna by, among other actions, using its confidential information and trade secrets and violating restrictive covenant agreements.

115.    Upon information and belief, Cotecna not only allowed itself to knowingly profit from the Individual Defendants' unlawful misappropriation and deceptive trade practices, it aided, abetted, and encouraged their unlawful competition with the specific intent of harming Bureau Veritas and depriving Bureau Veritas of its customers and competitive advantage.

116.    Thus, Cotecna conspired with the Individual Defendants to commit the unlawful acts described and alleged herein to unlawfully compete against Bureau Veritas and transfer Bureau Veritas' business to Cotecna.   Defendants are therefore liable for conspiracy to intentionally and unlawfully harm Bureau Veritas.

117.    Pursuant to La. Civil Code art. 2324(A), Defendants are solidarily liable for any and all damages caused by these intentional and willful acts of conspiracy.

## COUNT X – FRAUD
### (against Nanoo)

118.    Bureau Veritas incorporates by reference the preceding paragraphs in the Complaint.

119.    Nanoo committed fraud by failing to disclose her self-dealing and actions with respect to her theft of the misappropriated confidential information and trade secrets despite an obligation to do so.

120.    Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction.

121.    Fraud may result from misrepresentation or from silence.   La. Civ. Code art. 1953.

122.    By secreting absconding with Bureau Veritas' confidential information and trade secrets, Nanoo's intention was to obtain an unjust advantage for herself and co-conspirators and to cause a loss to Bureau Veritas.

## COUNT XI – INJUNCTIVE RELIEF

123.    Bureau Veritas incorporates by reference the preceding paragraphs in the Complaint.

124.    Pursuant to the DTSA and the LUTSA, Bureau Veritas is entitled to an injunction preventing any actual or threatened misappropriation of its trade secrets by Nanoo, Hunter, Laurie, and Cotecna, each of their agents, servants, employees, and attorneys, and other persons who are in active concert or participation with any of the foregoing (collectively, the "Covered Persons").

125.    This injunctive relief should include, without limitation, an order prohibiting the Covered Persons from using or disclosing any of Bureau Veritas' trade secrets, including, without limitation, all information regarding Bureau Veritas' products, services, systems, designs, inventions, research and development, processes, techniques, protocols, training, finances (including prices, costs and revenues), budgets, forecasts, marketing strategies, marketing plans, sales, sales strategies, sales methods, operations, prospects, pricing, pricing strategies, programs, methods of operation, prospective and existing contracts, customer lists, customer preferences, vendor lists, vendor preferences, supplier lists, laboratory equipment lists, and supplier preferences.

126.    Further, the injunctive relief should include an order requiring the Covered Persons to return to Bureau Veritas, and not keep, any and all trade secrets of Bureau Veritas, including, without limitation, any of the information listed above in paragraph 125.

127.    The injunctive relief additionally should include an order requiring Nanoo and Laurie to comply with the confidentiality obligations in their Confidentiality Agreements, Nanoo and Hunter to comply with the confidentiality obligations in their Restrictive Covenant Agreements, Hunter to comply with the non-competition, non-solicitation, and non-recruitment covenants in his Restrictive Covenant Agreement, and Nanoo to comply with the non-solicitation and non-recruitment covenants in her Restrictive Covenant Agreement. Bureau Veritas requests that the Court contractually toll the duration of the non-competition and non-solicitation covenants in Hunter's and Nanoo's Restrictive Covenant Agreements, in accordance with Section 2(c) thereof, for a period of time based on the length of time of Hunter's and Nanoo's breaches of their non-competition and/or non-solicitation covenants and add such period of time to the duration of the restrictions in the permanent injunction enforcing the restrictive covenants.

128.    Had the Individual Defendants not breached their duties and obligations to Bureau Veritas—in particular, but without limitation, their duties not to act in opposition to Bureau Veritas' interests, not to use their position with Bureau Veritas for personal gain at the expense of Bureau Veritas, not to use Bureau Veritas' property and information for their own purpose or for the purpose of any third parties, and to disclose that they were engaged in negotiations for their own benefit and contrary to the interests of Bureau Veritas—none of the Covered Persons would have access to the trade secrets and/or confidential information listed in paragraph 125 above.

129.   Nanoo also has failed to return to Bureau Veritas the confidential information and trade secrets stored on her personal external hard drives and Dropbox account.

130.   Bureau Veritas has a substantial likelihood of prevailing on the merits of its claims.

131.   Unless the Covered Persons are enjoined from the conduct described herein, there is a substantial threat that Bureau Veritas will continue to suffer irreparable harm, including loss and misuse of its confidential information and trade secrets, loss of goodwill, and financial losses that are presently not calculable.

132.   The irreparable harm that Bureau Veritas will suffer if injunctive relief is denied outweighs the potential harm (if any) to Defendants if injunctive relief is granted.

133.   Granting the requested injunctive relief will not disserve the public interest

134.   Bureau Veritas has no adequate remedy at law.

135.   Bureau Veritas is entitled to preliminary and permanent injunctive relief as set forth herein.

## VI.
## DAMAGES

136.   Bureau Veritas incorporates by reference the preceding paragraphs in the Complaint.

137.   As a result of Defendants' actions, Bureau Veritas has been damaged. Accordingly, Bureau Veritas requests all actual damages resulting from, or proximately caused by, Defendants' actions as described in this Complaint.

138.   Further, Defendants' conduct has been intentional, malicious, and willful and, therefore, entitles Bureau Veritas to an award of exemplary damages.

## VII.
## ATTORNEYS' FEES

139.    Bureau Veritas incorporates by reference the preceding paragraphs in the Complaint.

140.    As a result of Defendants' actions, Bureau Veritas has engaged the undersigned attorneys and agreed to pay their reasonable attorneys' fees, costs, and expenses incurred in prosecuting this suit to protect Bureau Veritas' rights. Bureau Veritas seeks recovery of these attorneys' fees, costs, and expenses as allowed by law and/or contract.

## VIII.
## CONDITIONS PRECEDENT

141.    All conditions precedent have been performed or have occurred, entitling Bureau Veritas to the relief requested in this Complaint.

## IX.
## JURY DEMAND

142.    Bureau Veritas demands a trial by jury.

## X.
## REQUEST FOR RELIEF

For the preceding reasons, Bureau Veritas respectfully requests that this Court:

1.    Enter judgment in its favor and against Defendants and order Defendants to pay damages to Bureau Veritas, in an amount to be proved at trial, plus interest, costs, exemplary damages, and attorneys' fees as allowed by law and/or contract;

2.    Enter preliminary and permanent injunctions ordering that Nanoo, Hunter, Laurie, and Cotecna, and each of their agents, servants, employees, and attorneys, and other persons who are in active concert or participation with any of the foregoing (collectively, the Covered Persons"):

   a.    are restrained and enjoined from directly or indirectly disclosing, transmitting, relying upon, or otherwise using for any purpose whatsoever Bureau Veritas' Confidential Information, which, for purposes of such injunctive relief, is defined to mean:

i. all information relating to Bureau Veritas' internal operations, policies and procedures, business strategies, pricing, billing information, actual or potential customer lists, contracts, contract terms and conditions, sales lists, process descriptions, financial data, marketing plans, technology, software source codes, research and development plans, business plans, computer programs, computer software and systems, inventions, developments, formulas, employee lists, employee salary information, and other non-public information regarding Bureau Veritas' personnel;

ii. all information regarding Bureau Veritas' products, services, systems, designs, inventions, research and development, processes, techniques, protocols, training, finances (including prices, costs and revenues), budgets, forecasts, marketing strategies, marketing plans, sales, sales strategies, sales methods, operations, prospects, pricing, pricing strategies, programs, methods of operation, prospective and existing contracts, customer lists, customer preferences, vendor lists, vendor preferences, supplier lists, laboratory equipment lists, and supplier preferences; and

iii. customer and employee contact information acquired from Bureau Veritas;

b. are restrained and enjoined from directly or indirectly disclosing, transmitting, relying upon, or otherwise using for any purpose whatsoever any information that Defendants accessed, copied, printed, imaged, exported, or downloaded from Bureau Veritas, including, without limitation, documents, files, or electronically stored information that Defendants accessed, exported, downloaded, removed, printed, imaged, or copied from Bureau Veritas or Bureau Veritas' computers, networks, software programs, file management systems, computer hardware, hard drives, or servers, including, without limitation, all copies, recordings, prints, or images of any Confidential Information;

c. must return to Bureau Veritas, within 48 hours: (i) any of the Confidential Information that is in their possession, custody, or control, including, without limitation, any electronically stored information or hard copy material; and (ii) any property of Bureau Veritas that is in their possession, custody, or control without deleting, over-writing, destroying, discarding, or otherwise altering any records, data, documents, evidence, communications, or other information electronically stored;

d. must produce a list, within five days, of any and all computers, computer hard drives, PDAs, tablets, i-Pads, smart phones, email accounts, electronic storage devices, external hard drives, cloud storage accounts, online web-based file sharing accounts, memory devices, flash drives, servers, networks, or like

devices capable of storing electronic data in their possession, custody, or control and, within five days thereafter, provide access to, for forensic imaging and inspection, any such devices as requested by Bureau Veritas;

e.  must preserve all evidence that may be relevant to Bureau Veritas' claims and not delete, over-write, destroy, discard, or otherwise alter any records, data, property, documents, evidence, communications, or other information, including, without limitation, any electronically stored information or hard copy material, that may be subject to discovery; and

f.  must, after the preservation of evidence by the forensic copying/mirroring of electronic information on the personal computing devices (including any desktop computers, laptop computers, tablets, smart phones, or electronic storage devices) of Covered Persons, return to Bureau Veritas any Confidential Information that is in their possession, custody, or control, and to the extent that any such information is maintained in electronic form must, after such information is forensically copied (to preserve an image) and returned to Bureau Veritas, purge or destroy any electronic record of such information, in a manner that does not allow the Confidential Information to be retrieved or restored, and certify to Bureau Veritas, under oath, that the Confidential Information has been thus purged or destroyed;

3.  Enter preliminary and permanent injunctions ordering that Nanoo and each of her agents, servants, employees, and attorneys, and other persons who are in active concert or participation with any of the foregoing are restrained and enjoined from, through the expiration of such covenants plus any period of time in which Nanoo was in breach of the covenant up to the duration of such covenant:

a.  directly or indirectly, in the Restricted Area, soliciting business from or interfering with, or attempting to solicit business from or interfere with, any actual or prospective customer, service provider, vendor, or supplier of Bureau Veritas (or any affiliate) with whom Bureau Veritas (or any affiliate) did business or solicited within the eighteen (18) months prior to Nanoo's termination from employment and (1) who or which Nanoo contacted, called on, serviced, or did business with on behalf of Bureau Veritas (or any affiliate) during her employment, or (2) about whom Nanoo received Confidential Information;

b.  directly or indirectly, in the Restricted Area, inducing, or attempting to induce, any actual or prospective customer, service provider, vendor, or supplier of Bureau Veritas (or any affiliate) with whom Bureau Veritas (or any affiliate) did business or solicited within the eighteen (18) months prior to Nanoo's termination from employment and (1) who or which Nanoo contacted, called on, serviced, or did business with on behalf of Bureau Veritas (or any affiliate) during her employment, or (2) about whom Nanoo

received Confidential Information, to curtail or cancel any business or contracts with Bureau Veritas (or any affiliate);

c. directly or indirectly hiring, soliciting, or recruiting, or attempting to hire, solicit, or recruit, or encouraging to leave or otherwise cease his/her employment with Bureau Veritas, any individual who is an employee, or was an employee within the six (6) month period prior to Nanoo's termination, of Bureau Veritas; and

d. "Restricted Area" for purposes of subsections (a) and (b) means Calcasieu Parish, East Baton Rouge Parish, East Feliciana Parish, Jefferson Parish, Jefferson Davis Parish, Lafayette Parish, Plaquemines Parish, St. Charles Parish, and St. James Parish;

4.  Enter preliminary and permanent injunctions ordering that Hunter and each of his agents, servants, employees, and attorneys, and other persons who are in active concert or participation with any of the foregoing are restrained and enjoined from, through the expiration of such covenants plus any period of time in which Hunter was in breach of the covenant up to the duration of such covenant:

a. Directly or indirectly becoming employed by or performing services for any business, individual, partnership, firm, corporation, or other entity that is engaged in, or about to become engaged in, any testing, inspection, and/or certification business (including, without limitation, Cotecna) within the Restricted Area, provided that Hunter's provision of services are the same as or substantially similar to the services he provided to Bureau Veritas or that are otherwise likely to result in the use or disclosure of Confidential Information;

b. directly or indirectly, in the Restricted Area, soliciting business from or interfering with, or attempting to solicit business from or interfere with, any actual or prospective customer, service provider, vendor, or supplier of Bureau Veritas (or any affiliate) with whom Bureau Veritas (or any affiliate) did business or solicited within the eighteen (18) months prior to Hunter's termination from employment and (1) who or which Hunter contacted, called on, serviced, or did business with on behalf of Bureau Veritas (or any affiliate) during his employment, or (2) about whom Hunter received Confidential Information;

c. directly or indirectly, in the Restricted Area, inducing, or attempting to induce, any actual or prospective customer, service provider, vendor, or supplier of Bureau Veritas (or any affiliate) with whom Bureau Veritas (or any affiliate) did business or solicited within the eighteen (18) months prior to Hunter's termination from employment and (1) who or which Hunter contacted, called on, serviced, or did business with on behalf of Bureau Veritas (or any affiliate) during his employment, or (2) about whom Hunter

received Confidential Information, to curtail or cancel any business or contracts with Bureau Veritas (or any affiliate);

d.   directly or indirectly hiring, soliciting, or recruiting, or attempting to hire, solicit, or recruit, or encouraging to leave or otherwise cease his/her employment with Bureau Veritas, any individual who is an employee, or was an employee within the six (6) month period prior to Hunter's termination, of Bureau Veritas; and

e.   "Restricted Area" for purposes of subsections (a)-(c) means Calcasieu Parish, East Baton Rouge Parish, East Feliciana Parish, Jefferson Parish, Jefferson Davis Parish, Lafayette Parish, Plaquemines Parish, St. Charles Parish, and St. James Parish;

5.   Grant Bureau Veritas all other relief, in law or in equity, as this Court deems proper and to which it may be justly entitled.

Dated:  December 11, 2020                      Respectfully submitted,

McGuireWoods LLP

*/s/ Miles O. Indest*
Miles O. Indest (T.A.)
La. State Bar No. 37474
mindest@mcguirewoods.com
600 Travis, Suite 7500
Houston, Texas  77002
(832) 255-6361 Telephone
(832) 214-9931 Facsimile

Yasser A. Madriz
(*pro hac vice* forthcoming)
Texas State Bar No. 24037015
ymadriz@mcguirewoods.com
Meghaan C. Madriz
(*pro hac vice* forthcoming)
Texas State Bar No. 24070241
mmadriz@mcguirewoods.com
A. Wolfgang McGavran
(*pro hac vice* forthcoming)
Texas State Bar No. 24074682
wmcgavran@mcguirewoods.com

**ATTORNEYS FOR PLAINTIFF**

MW138628634v3

41